MEMORANDUM OPINION AND ORDER REGARDING DEFENDANT’S MOTION FOR SUMMARY JUDGMENT
 

 BENNETT, District Judge.
 

 TABLE OF CONTENTS
 

 I. INTRODUCTION AND BACKGROUND...................................1379
 

 II. STANDARDS FOR SUMMARY JUDGMENT...............................1380
 

 III. FACTUAL BACKGROUND...............................................1382
 

 A. Undisputed Facts.....................................................1382
 

 B. Disputed Facts.......................................................1385
 

 IV. LEGAL ANALYSIS......................................................1388
 

 A. The Federal Disability Discrimination Claim .............................1388
 

 1. The origins of the ADA............................................1388
 

 2. Disability discrimination under the ADA.............................1391
 

 a. Substantial limitations on major life activities......................1391
 

 b. Qualified individual with a disability..............................1393
 

 3. Plaintiffs prima facie case and the burden-shifting framework for ADA
 

 claims .........................................................1396
 

 4. Valentine’s ADA claim.............................................1398
 

 a. Valentine’s prima facie case and the process to determine “reason-
 

 able accommodation”.........................................1398
 

 i. The “interactive process” to determine reasonable accommo-
 

 dation .................................................1398
 

 ii. Breakdown of the process..................................1399
 

 b. Second and third stage issues...................................1401
 

 B. The State Disability Discrimination Claim................................1402
 

 V. CONCLUSION..........................................................1402
 

 
 *1379
 
 The defendant’s motion for summary judgment in this employment discrimination lawsuit pursuant to the Americans with Disabilities Act (ADA) and comparable provisions of the Iowa Civil Rights Act presents a nettlesome question that is apparently one of first impression. Where a plaintiff employee has failed to meet job qualifications under an agreed accommodation to his disability, is a genuine issue of material fact as to disability discrimination' generated by evidence that the defendant employer offered a further accommodation — one different from any the plaintiff suggested — but then withdrew the offer after the plaintiff had accepted it? The plaintiff, who suffers from asthma, alleges that his employer failed to make reasonable accommodations to his disability and fired him because of his disability. The defendant employer has moved for summary judgment on the ground that it did all that was required by law and more to provide reasonable accommodations to the plaintiff, but that, after a trial period, those accommodations failed to make the plaintiff a qualified employee, because they did not resolve the plaintiffs absenteeism problem. Hence, the employer contends that it legitimately terminated the plaintiff for excessive and unpredictable absenteeism and poor performance, even though it allegedly offered, then withdrew, part-time employment as a possible further accommodation of the plaintiffs absenteeism problem. The plaintiff asserts that genuine issues of material fact should preclude summary judgment in this case. The plaintiff asserts that his average weekly hours over the nine months preceding his termination generate a genuine issue of material fact as to whether he “normally” met the employer’s attendance requirements. He also asserts that withdrawal of the offer of part-time employment and refusal to consider other accommodations raise inferences of disability discrimination.
 

 I. INTRODUCTION AND BACKGROUND
 

 Plaintiff Arthur P. Valentine filed this lawsuit on April 10, 1995, against his former employer, American Home Shield Corporation (AHS). Valentine had been employed at AHS from March 12, 1990, until his employment terminated in mid-January of 1994. AHS is a “home warranty” corporation that sells and services “home service contracts,” or insurance policies, for major home appliances. For the bulk of his time as an employee of AHS, Valentine was engaged in telemarketing sales of AHS’s service contracts.
 

 Valentine, who suffers from asthma,
 
 [1]
 
 alleges in his complaint that he was terminated because of his disability, or because he was “perceived” to have a disability, which had caused him to miss work or leave work early on a number of occasions. Specifically, Count I of Valentine’s complaint alleges that AHS violated the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101
 
 et
 
 sec?., because AHS failed to make a reasonable accommodation to his disability and his disability or perceived disability was a motivating factor in his discharge. Count II alleges violation of comparable provisions of the Iowa Civil Rights Act (ICRA), Iowa Code Ch. 216, on essentially the same grounds as stated in Count I. Valentine seeks actual and punitive damages on his ADA claim and actual damages on his ICRA claim. Valentine does not seek reinstatement on either claim. Trial is set to begin in this matter on October 7,1996.
 

 On May 30,1996, just prior to the deadline for dispositive motions, AHS moved for summary judgment on both of Valentine’s claims. In this motion, AHS asserts that there are no genuine issues of material fact and that, as a matter of law, Valentine is not a “qualified individual” under the ADA, because he is unable to perform an essential function of his job, attendance, even with reasonable accommodations. AHS contends further that there
 
 *1380
 
 is no evidence of discriminatory animus on its part. It also contends that it had a legitimate, non-discriminatory reason for removing Valentine from his full-time status and instead offering him part-time employment, because of Valentine’s failure to attain the attendance required to maintain full-time status under either the accommodation AHS allowed for his disability, or under Valentine’s somewhat different requested “reasonable accommodation,” during the eight-week period the parties had agreed to try the accommodation. Finally, AHS argues that even if it in fact terminated Valentine, rather than Valentine quitting, which is AHS’s version of events, it is entitled to summary judgment, because it was entitled to terminate Valentine for poor attendance, which made him unqualified for his position either with or without accommodation, and, specifically, for poor performance during the eight-week trial of the accommodation arrangement. AHS asserts that it is entitled to summary judgment on Valentine’s ICRA claim, because Valentine was not “qualified” for a full-time position as a telemarketer at AHS owing to his inability to attain the required level of attendance.
 

 Valentine’s resistance to AHS’s motion for summary judgment was filed on August 5, 1996. Valentine asserts that there are genuine issues of material fact precluding summary judgment in favor of AHS. Valentine asserts that the court cannot find, as a matter of law, that attendance was an essential element of his job at AHS that could not be met by reasonable accommodation. Valentine argues that AHS “was required to determine whether there was
 
 any
 
 reasonable accommodation it could make to permit [Valentine] to perform the essential functions of his job without creating undue hardship on AHS.” Valentine now identifies a number of assertedly reasonable accommodations AHS did
 
 not
 
 offer. Valentine also asserts that there are genuine issues of material fact as to whether AHS had a discriminatory animus. He also asserts that AHS is not entitled to summary judgment on his claim under the ICRA, because of genuine issues of material fact concerning whether his disability could be accommodated.
 

 AHS filed a reply brief on August 19, 1996.
 
 [2]
 
 In its reply, AHS contends that Valentine cannot raise purportedly reasonable accommodations years after his termination that he never presented to AHS at the time. AHS further disputes the reasonableness of such accommodations, and disputes that Valentine has succeeded in raising any other genuine issues of material fact.
 

 The court heard oral arguments telephonically on AHS’s motion for summary judgment on August 26, 1996. At the oral arguments, plaintiff Arthur P. Valentine was represented by counsel David H. Goldman and Michael J. Carroll of Goldman & Carroll, P.C., in Des Moines, Iowa. Defendant AHS was represented by counsel Rebecca Boyd Parrott of Dickinson, Mackaman, Tyler & Hagen, P.C., in Des Moines, Iowa.
 

 The court turns first to the standards applicable to motions for summary judgment, then to a discussion of the undisputed and disputed facts as shown by the record and the parties’ submissions, and finally to the legal analysis of whether AHS is entitled to summary judgment on either of Valentine’s claims.
 

 II. STANDARDS FOR SUMMARY JUDGMENT
 

 The Eighth Circuit Court of Appeals recognizes “that summary judgment is a drastic remedy and must be exercised with extreme care to prevent taking genuine issues of fact away from juries.”
 
 Wabun-Inini v. Sessions,
 
 900 F.2d 1234, 1238 (8th Cir.1990). On the other hand, the Federal Rules of Civil Procedure have authorized for nearly 60 years “motions for summary judgment upon proper showings of the lack of a genuine, triable issue of material fact.”
 
 Celotex Corp. v. Catrett,
 
 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986). Thus, “summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the
 
 *1381
 
 Federal Rules as a whole, which are designed ‘to secure the just, speedy and inexpensive determination of every action.’”
 
 Wabun-Inini,
 
 900 F.2d at 1238 (quoting
 
 Celotex,
 
 477 U.S. at 327, 106 S.Ct. at 2554-55);
 
 Hartnagel v. Norman,
 
 953 F.2d 394, 396 (8th Cir.1992).
 

 The standard for granting summary judgment is well established. Rule 56 of the Federal Rules of Civil Procedure states in pertinent part:
 

 Rule 56. Summary Judgment
 

 (b) For Defending Party. A party against whom a claim ... is asserted ... may, at any time, move for summary judgment in the party’s favor as to all or any part thereof.
 

 (c) Motions and Proceedings Thereon____
 
 The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. ■
 

 Fed.R.Civ.P. 56(b) & (c) (emphasis added);
 
 see also Celotex, 477
 
 U.S. at 322-23, 106 S.Ct. at 2552-53;
 
 Reliance Ins. Co. v. Shenandoah South, Inc.,
 
 81 F.3d 789, 791 (8th Cir.1996);
 
 Beyerbach v. Sears,
 
 49 F.3d 1324, 1325 (8th Cir.1995);
 
 Munz v. Michael,
 
 28 F.3d 795, 798 (8th Cir.1994);
 
 Roth v. U.S.S. Great. Lakes Fleet, Inc.,
 
 25 F.3d 707, 708 (8th Cir.1994);
 
 Cole v. Bone,
 
 993 F.2d 1328, 1331 (8th Cir. 1993);
 
 Woodsmith Publishing Co. v. Meredith Corp.,
 
 904 F.2d 1244, 1247 (8th Cir. 1990);
 
 Wabun-Inini,
 
 900 F.2d at 1238 (citing Fed.R.Civ.P. 56(c)).
 
 [3]
 
 A court considering a motion for summary judgment must view all the facts in the light most favorable to the nonmoving party, here Valentine, and give Valentine the benefit of all reasonable inferences that can be drawn from the facts.
 
 Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,
 
 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting
 
 United States v. Diebold, Inc.,
 
 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962));
 
 Rifkin v. McDonnell Douglas Corp.,
 
 78 F.3d 1277, 1280 (8th Cir.1996);
 
 Marts v. Xerox, Inc.,
 
 77 F.3d 1109, 1112 (8th Cir.1996);
 
 Munz,
 
 28 F.3d at 796;
 
 Allison v. Flexway Trucking, Inc.,
 
 28 F.3d 64, 66 (8th Cir.1994);
 
 Johnson v. Group Health Plan, Inc.,
 
 994 F.2d 543, 545 (8th Cir.1993);
 
 Burk v. Beene,
 
 948 F.2d 489, 492 (8th Cir.1991);
 
 Coday v. City of Springfield,
 
 939 F.2d 666, 667 (8th Cir.1991),
 
 cert. denied,
 
 502 U.S. 1094, 112 S.Ct. 1170, 117 L.Ed.2d 416 (1992).
 

 Procedurally, the moving party, here AHS, bears “the initial responsibility of informing the district court of the basis for [its] motion and identifying those portions of the record which show lack of a genuine issue.”
 
 Hartnagel, 953
 
 F.2d at 395 (citing
 
 Celotex,
 
 477 U.S. at 323, 106 S.Ct. at 2552-53);
 
 see also Reed v. Woodruff County, Ark.,
 
 7 F.3d 808, 810 (8th Cir.1993). AHS is not required by Rule 56 to support its motion with affidavits or other similar materials negating the opponent’s claim.
 
 Id.
 

 “When a moving party has carried its burden under
 
 Rule
 
 56(c), its opponent must do more than simply show there is some metaphysical doubt as to the material facts.”
 
 Matsushita,
 
 475 U.S. at 586, 106 S.Ct. at 1356. Valentine is therefore required under Rule 56(e) to go beyond the pleadings, and by affidavits, or by the “depositions, answers to interrogatories, and admissions on file,” designate “specific facts showing that there is a genuine issue for trial.”
 
 Fed.R.Civ.P.
 
 56(e);
 
 Celotex,
 
 477 U.S. at 324, 106 S.Ct. at 2553;
 
 McLaughlin v. Esselte Pendaflex Corp.,
 
 50 F.3d 507, 511 (8th Cir.1995);
 
 Beyerbach,
 
 49 F.3d at 1325. Although “direct proof is not required to create a jury question, ... to avoid summary judgment, ‘the facts and circumstances relied upon must attain the dignity of substantial evidence and must not be such as merely to create a suspicion.’ ”
 
 Metge v. Baehler,
 
 762 F.2d 621, 625 (8th Cir.1985) (quoting
 
 Impro Prods.,
 
 
 *1382
 

 Inc. v. Herrick,
 
 715 F.2d 1267, 1272 (8th Cir.1983),
 
 cert. denied,
 
 465 U.S. 1026, 104 S.Ct. 1282, 79 L.Ed.2d 686 (1984)),
 
 cert. denied sub nom. Metge v. Bankers Trust Co.,
 
 474 U.S. 1057, 106 S.Ct. 798, 88 L.Ed.2d 774 (1986). The necessary proof that the non-moving party must produce is not precisely measurable, but the evidence must be “such that a reasonable jury could return a verdict for the nonmoving party.”
 
 Anderson v. Liberty Lobby, Inc.,
 
 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986);
 
 Allison,
 
 28 F.3d at 66.
 

 In
 
 Anderson,
 
 477 U.S. at 249, 106 S.Ct. at 2510-11,
 
 Celotex,
 
 477 U.S. at 323-24, 106 S.Ct. at 2552-53, and
 
 Matsushita,
 
 475 U.S. at 586-87, 106 S.Ct. at 1355-56, the Supreme Court established that a summary judgment motion should be interpreted by the trial court to accomplish its purpose of disposing of factually unsupported claims, and the trial judge’s function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.
 
 Johnson v. Enron Corp.,
 
 906 F.2d 1234, 1237 (8th Cir.1990). The trial court, therefore, must “assess the adequacy of the nonmovants’ response and whether that showing, on admissible evidence, would be sufficient to carry the burden of proof at trial.”
 
 Hartnagel,
 
 953 F.2d at 396 (citing
 
 Celotex,
 
 477 U.S. at 322, 106 S.Ct. at 2552). If Valentine fails to make a sufficient showing of an essential element of a claim with respect to which he has the burden of proof, then AHS is ‘‘entitled to judgment as a matter of law.”
 
 Celotex,
 
 477 U.S. at 323, 106 S.Ct. at 2552;
 
 Woodsmith,
 
 904 F.2d at 1247. However, if the court can conclude that a reasonable trier of fact could return a verdict for the nonmovant, then summary judgment should not be granted.
 
 Anderson,
 
 477 U.S. at 248, 106 S.Ct. at 2510;
 
 Burk,
 
 948 F.2d at 492;
 
 Woodsmith,
 
 904 F.2d at 1247.
 

 The Eighth Circuit Court of Appeals has cautioned that “summary judgment should seldom be used in employment-discrimination cases.”
 
 Crawford v. Runyon,
 
 37 F.3d 1338, 1341 (8th Cir.1994) (citing
 
 Johnson v. Minnesota Historical Soc’y,
 
 931 F.2d 1239, 1244 (8th Cir.1991);
 
 Hillebrand v. M-Tron Indus., Inc.,
 
 827 F.2d 363, 364 (8th Cir.1987),
 
 cert. denied,
 
 488 U.S. 1004, 109 S.Ct. 782, 102 L.Ed.2d 774 (1989));
 
 see also Hardin v. Hussmann Corp.,
 
 45 F.3d 262 (8th Cir.1995) (“summary judgments should only be used sparingly in employment discrimination eases,” citing
 
 Haglof v. Northwest Rehabilitation, Inc.,
 
 910 F.2d 492, 495 (8th Cir.1990);
 
 Hillebrand,
 
 827 F.2d at 364). Summary judgment is appropriate only in “those rare instances where there is no dispute of fact and where there exists only one conclusion.”
 
 Johnson,
 
 931 F.2d at 1244; see
 
 also Webb v. St. Louis Post-Dispatch,
 
 51 F.3d 147, 148 (8th Cir.1995) (quoting
 
 Johnson,
 
 931 F.2d at 1244);
 
 Crawford,
 
 37 F.3d at 1341 (quoting
 
 Johnson,
 
 931 F.2d at 1244). The court reasoned that “[bjecause discrimination cases often depend on inferences rather than on direct evidence, summary judgment should not be granted unless the evidence could not support any reasonable inference for the nonmovant.”
 
 Crawford,
 
 37 F.3d at 1341 (holding that there was a genuine issue of material fact precluding summary judgment);
 
 Johnson,
 
 931 F.2d at 1244. However, the Eighth Circuit Court of Appeals has also observed that, “[ajlthough summary judgment should be used sparingly in the context of employment discrimination cases,
 
 Crawford v. Runyon,
 
 37 F.3d 1338, 1341 (8th Cir.1994), the plaintiffs evidence must go beyond the establishment of a prima facie case to support a reasonable inference regarding the alleged illicit reason for the defendant’s action.”
 
 Landon v. Northwest Airlines, Inc.,
 
 72 F.3d 620, 624 (8th Cir.1995) (citing
 
 Reich v. Hoy Shoe Co.,
 
 32 F.3d 361, 365 (8th Cir.1994)).
 

 With these standards in mind, the court turns to consideration of the undisputed and disputed facts of this case.
 

 III. FACTUAL BACKGROUND
 

 A Undisputed Facts
 

 The record reveals that the following facts are undisputed. Valentine was employed at AHS from March 12, 1990, until his employment terminated in mid-January of 1994. AHS is a “home warranty” corporation that sells and services “home service contracts,” or insurance policies, for major home appliances. In the first instance, such contracts
 
 *1383
 
 are usually purchased by the seller of a home for some or all of the home’s major appliances for the first year after the sale of the home. However, as the expiration date approaches, AHS contacts by telephone the buyer of the home to offer the buyer the opportunity to renew the policy for another year. Such inquiries are performed by AHS Renewal Representatives from a telemarketing center in Carroll, Iowa.
 

 Valentine began working for AHS as an AHS Renewal Representative. However, in late December of 1992, Valentine accepted a lateral transfer to a position in AHS’s “Referral” Department. The nature of Valentine’s employment in the Referral Department is not clear from the record. However, what is clear, and undisputed, is that Valentine received a warning on January 5, 1993, to improve his attendance immediately or he would be placed on an “Employee Performance Improvement Plan.” In the twelve month period preceding October 4,1993, Valentine missed 114.5 hours of work. Despite the prior warning, and a score of “1,” or lowest on a one-to-five scale, in attendance on a performance evaluation on July 16, 1993,
 
 [4]
 
 Valentine’s performance evaluation was generally very favorable.
 

 On November 16, 1993, Valentine was again laterally transferred, this time back to the Renewals Department. The parties agree that this transfer was not a demotion, promotion, or disciplinary measure. It was instead a transfer back to the Renewal Department in precisely the same position Valentine had held from March 2, 1990, to the end of December of 1992, with the same job duties and expectations. Valentine had enjoyed a good relationship with Deb Kulbel, the Renewals Department supervisor, during his prior employment in the Renewals Department and that relationship had remained favorable during his interim employment in the Referrals Department. Kulbel in fact expressed a desire to have Valentine back in the Renewals Department.
 

 Athough the parties' agree that the re-transfer to Renewals was not a “disciplinary” measure, upon his retransfer, AHS supervisory personnel informed Valentine that he would be subject to a 90-day probationary period that was applicable to all employees for the first ninety days they were employed in a new position. The applicable AHS policy states as follows:
 

 The first 90 days of continuous employment at AHS, or the first 90 days of continuous employment in a different position from that previously held at the Company, is considered an introductory period. During that time you will learn your duties, get acquainted with your fellow employees and have a chance to decide whether you are and will be happy with your job. Your supervisor will have the opportunity to determine whether you are adapting to your new work at the company.
 

 At the end of your introductory period, your performance will be reviewed. If the Company decides you should continue to be employed, you will be advised of any improvements expected from you and you will be given the opportunity to express any recommendations that you have to improve efficiency.
 

 Completion of the introductory period does not entitle you to remain employed with the Company. Both you and the Company are free, at any time, with or without notice and with or without cause, to end the employment relationship and your compensation. After completion of the introductory period, full-time employees may be eligible for the benefits described in this handbook. Part-time employees may be eligible for some of the benefits described in this handbook.
 

 Defendant’s Exhibit 4, Service Master Consumer Services/American Home Shield personnel handbook (hereinafter “AHS Personnel Handbook”), pp. 6-7. When Valentine disputed the applicability of this handbook provision to him, because he had previously been employed in the Renewals Department, he was informed that he would be on “probation” anyway in view of past attendance problems. AHS’s offer to Valentine for the transfer back to Renewals, as presented by Kulbel and Peg Sanders, AHS’s People Ser
 
 *1384
 
 vices manager, or personnel director, for the Carroll, Iowa, facility, was that “[i]f you have an unscheduled absence during this [probationary] time, your employment status will be reduced to part-time.” Other performance standards were also spelled out in the offer. Valentine accepted the transfer.
 

 AHS’s Personnel Handbook states the following policy on attendance:
 

 D.
 
 PUNCTUALITY AND ATTENDANCE
 

 As an employee of AHS you are expected to be regular in attendance and punctual. Any tardiness or absence causes problems for your fellow employees and your supervisor. When you are absent, your work load must be performed by others,just as you must assume the work load of others who are absent.
 

 Employees are expected to report to work as scheduled, on time and prepared to start work. Employees are also expected to remain at work for their entire work schedule, except for meal and rest periods or when required to leave on authorized Company business. Late arrivals, early departures or other absences from scheduled hours are disruptive and must be avoided.
 

 If you are unable to report for work on any particular day, you must call your supervisor/manager or People Support Services at least one hour before the time you are scheduled to begin working for that day. In all cases of absence or tardiness, employees must provide their supervisor with an honest explanation. Employees must also inform their supervisor of the expected duration of any absence. Absent extenuating circumstances, you must call in on any day you are scheduled to work and will not report for work.
 

 Excessive absenteeism or tardiness will ' not be tolerated. Any unexeused absence is considered excessive.
 

 If you fail to report for work without notification to your supervisor, and your absence continues for a period of three days, the Company will consider that you have abandoned your employment and have voluntarily terminated.
 

 AHS Personnel Handbook, pp. 16-17. Valentine does not dispute that the “normal” full-time work schedule for employees in the Renewals Department was six hours per day, five days per week, or thirty hours per week total, Monday through Friday, and that employees were expected to work every third Saturday. Employees were not allowed to work Sundays or holidays. The normal six-hour work shift for Renewals employees was from 4:00 p.m. to 10:00 p.m., and, although shifts varied, employees were required to work the “core” hours of 6:00 p.m. to 9:00 p.m. This “core” time requirement is because the highest likelihood of reaching renewals customers by telephone at home is during the evening hours. Other contacts, during the afternoon or at work, may only be made if the customer has previously consented to be contacted at that time and place. Renewal Representatives’ days may be scheduled to contact some customers in the afternoon, then track the “core” hours across the time zones. However, no contacts are permitted under federal law after 9:00 p.m. in a time zone, so that Renewal Representatives cannot work past 11:00 p.m. (9:00 p.m. Pacific time).
 

 Shortly after his retransfer to the Renewals Department on November 16, 1993, Valentine had further absences. On November 22, 1993, Valentine left work after one hour, because he was having asthma problems. On November 23,1993, he called in sick, and on November 24 he again left work after two hours because of illness. Valentine had been scheduled to work six hours on each of these days. At about this time, Valentine requested a meeting with Sanders concerning a reasonable accommodation in his work schedule for his disability, his asthma. Sanders had such a meeting with Valentine and his treating physician, Dr. John Carroll. Valentine requested that he be allowed to average his weekly hours over an entire eight-week pay period. He also requested that the “corrective action” concerning his absences be removed from his file. However, AHS, through Sanders, agreed to allow only a different accommodation. Valentine needed to maintain a thirty-hour per week average over an eight-week period. However, the eight weeks would be divided into four, two-week
 
 *1385
 
 periods. If he worked less than thirty hours during a particular week, he would be allowed to make up those hours during the following week,
 
 i.e.,
 
 average 60 hours in each two-week period for the eight-week pay period. Valentine was also given the flexibility to work up to eight hours in one day in order to “build up” or “make up” hours. Sanders, however, did not agree to remove the past disciplinary memos and warnings concerning attendance from Valentine’s personnel file. The parties also agreed that “vacation” days would be counted as six-hour days.'
 

 During the eight weeks beginning the week of November 21, 1993, and ending the week of January 9, 1994, Valentine took ten vacation days, around the 1993 holiday season, to visit relatives. These vacation days were counted as “hours worked” for purposes of the thirty-hour per week average at the rate of six hours per day. The parties dispute whether another day, January 4, 1994, should be counted as a vacation day or an unexcused absence. However, AHS asserts that even counting this day as vacation, Valentine failed to meet the requirements of the agreed accommodation. In addition to the ten (or eleven) days of vacation, Valentine had other absences during the eight-week pay period. Although Valentine did work additional time on certain days, he never worked more than seven hours in any one shift. Counting the disputed vacation day as excused time off, AHS and Valentine agree that his average for the eight-week period was only 28.75 hours per week.
 
 [5]
 
 In some of the two-week periods when Valentine met or exceeded the thirty-hours-per-week average, he used vacation or holiday time.
 

 At the end of the eight-week period, on January 17, 1994, Sanders called Dr. Carroll to ask whether he could recommend Valentine for a short-term disability leave in order to keep Valentine at full-time status. Dr. Carroll apparently stated that he could not state that Valentine was “disabled” such that he could qualify for such a short-term leave, but that he appreciated AHS’s efforts to keep Valentine on foil-time status.
 

 Following her conversation with Dr. Carroll, Sanders met with Valentine and Kulbel in her office on January 17, 1994. Sanders informed Valentine that he could no longer be considered a full-time employee. Sanders therefore informed Valentine that he would be placed on part-time status. Valentine became angry, and accused Sanders of “manipulating numbers,”
 
 [6]
 
 and left the office without accepting the offer of part-time employment. Valentine then went to his cubicle to get his coat and told a co-worker, “I’m gone. I’m out of here. Good-bye.” Valentine then left the building.
 

 Valentine returned on the morning of January 18, 1994, with a box to collect his belongings and to return AHS materials. Sanders approached Valentine and again asked if he would consider working part-time. Valentine responded that he did not feel he had been treated fairly and that he could not live on part-time income with no benefits. Sanders then mentioned Valentine’s COBRA benefits, but apparently did not specifically indicate that Valentine would be able to maintain his health insurance under COBRA, by paying the entire premium, if he worked part-time. Valentine did not accept the second offer of part-time employment.
 

 AHS contends, and Valentine does not dispute, that three other persons hired as renewal representatives between October 1992 and October 1993 had been terminated by the end of January 1994 for poor performance. The record does not indicate whether these employees were offered the alternative of part-time employment.
 

 B. Disputed Facts
 

 The record reflects that the following facts are in dispute. The question to be addressed below, in the court’s legal analysis, is whether these disputes of fact are material under the governing law, such that they preclude
 
 *1386
 
 summary judgment on either of Valentine’s claims.
 
 See, e.g.,
 
 Fed.R.Civ.P. 56(c);
 
 Celotex Corp.,
 
 477 U.S. at 322-23, 106 S.Ct. at 2552-53;
 
 Anderson,
 
 477 U.S. at 248, 106 S.Ct. at 2510;
 
 Beyerbach,
 
 49 F.3d at 1326;
 
 Hartnagel,
 
 953 F.2d at 394.
 

 Valentine asserts that there is a genuine issue of material fact concerning his attendance record prior to his retransfer to the Renewals Department. Although he does not dispute AHS’s contention that he missed 114.5 hours of work time in the twelve months prior to October 4, 1993, he asserts that AHS’s contention that this time was missed on fifteen “occasions” is vague. Valentine contends that an “occasion” could mean an individual day or a period of absence; thus one period of illness for several days might be counted as several “occasions” or only one “occasion.” Valentine also points out that AHS has provided no breakdown of the time he missed in terms of paid sick leave, vacation time, or unpaid sick leave. Valentine therefore asserts that there is a genuine issue of material fact about his attendance record. From the summary of his time card records Valentine has attached to his resistance, as part of Exhibit A, reflecting hours worked from May 16, 1993, through January 15, 1994, it appears that Valentine had absences on thirteen days between May 16, 1993, and October 4, 1993. These absences involved use of paid sick leave (on four days), vacation time (one day), or unpaid sick time (eight days), while two other days are indicated as “holidays.”
 

 Also, while Valentine does not contest the “normal” schedule for full-time representatives in the Renewals Department or the “core” time requirements, he asserts that these requirements provide no inference that AHS could not provide him with a reasonable accommodation. As to the accommodation agreement reached between Valentine and AHS, Valentine asserts that it was his understanding that if AHS’s proposal did not work out completely during the eight-week pay period, other efforts would be tried. Thus, Valentine asserts that AHS’s proffered accommodation was only agreed to for an eight-week “trial” period. Valentine asserts that it was
 
 not
 
 his understanding that if the accommodation did not work out during the eight-week trial period, he would be terminated or reduced from full-time status. Furthermore, he contends that his weekly average for the eight-week period was within five percent of a normally scheduled work week and should have been grounds for attempting further accommodations or permitting further efforts to attain the target of thirty hours per week. Valentine specifically asserts that an average of thirty hours per week was understood to be a “target” not a “requirement.”
 

 Valentine also points to deposition testimony of Dr. Carroll as clarifying his opinion concerning whether Valentine was “disabled.” Valentine asserts that Dr. Carroll was considering the term in relation to Social Security standards for “total disability,”
 
 i.e.,
 
 incapability of going to work and performing the functions of his job. Furthermore, Valentine points to Dr. Carroll’s deposition testimony as demonstrating that he did not mean to indicate that he thought AHS’s accommodation efforts had been adequate or all that AHS could have done when he expressed appreciation at AHS’s efforts to maintain Valentine’s full-time status.
 

 As to the January 17, 1994, meeting at which he was advised that AHS could no longer consider him a full-time employee, Valentine asserts that the failure of Sanders and Kulbel to consider other alternatives, and instead announcing a decision, was contrary to his understanding of the agreement to try AHS’s proposed accommodation and to consider further alternatives if it did not work out. He also rejects any inference that might arise from his reaction or conduct after that meeting as indicating that he was quitting his job at AHS. As to Sanders’s mention of COBRA benefits on January 18, 1994, Valentine asserts that had Sanders made it clear that COBRA would entitle him to maintain his health insurance, at his expense, while working part-time, he would have accepted the offer of part-time employment then and there.
 

 Valentine contends that his contact with AHS did not end on January 18, 1994. He contends that Sanders contacted him again by telephone on January 19, 1994, and again
 
 *1387
 
 offered to allow him to work part-time. Valentine contends that it was during this telephone call that he first learned that he could continue his health insurance under COBRA if he worked part-time. He states that he was also then advised that he would be allowed to work as many hours as he felt able, and that his access to “leads,” or lists of prospective renewal customers, would not be in any way restricted. He contends he was also advised that he would be allowed to work under the same commission schedule as before. Valentine contends that he accepted this offer of part-time employment, and asked if he should come in to work that day. Sanders purportedly told him' not to come in until January 20, 1994, because Kulbel was not at work on January 19. Valentine contends that Sanders called him on January 20, 1994, as he was about to leave for work to tell him that upper management had decided there was “too much history” involved in his employment record, and that they had therefore decided to accept his “resignation,” so that he need not return to work. AHS gives no comparable recitation of events on January 19 and 20, 1994, in its statement of undisputed facts, nor has it attempted to controvert Valentine’s statement of those events in its brief or reply brief. Instead, in its original brief, AHS contends that even if an offer of part-time employment was made, AHS was entitled to terminate Valentine rather than go through with the offer, because of Valentine’s poor performance.
 

 Thus, for its part, AHS contends that the record clearly demonstrates that Valentine was or could have been properly terminated for poor performance. AHS points to the termination of other employees for “poor performance” during late 1993 or early 1994 and asserts that Valentine’s performance records are as bad or worse than each of these employees. AHS also contends that Valentine’s performance after his retransfer to the Renewals Department was less good than that of a complete novice employee who had just been hired. Valentine, however, disputes this reading of his employment record and any comparison to that of other employees. Valentine contends that for some time after his retransfer to Renewals, he was finishing up work for the Referrals Department that he was required to complete. Thus, he was unable to devote all of his time at work to Renewals business. He also asserts that no one ever expressed any concerns about his progress or performance after his return to Renewals except as to his attendance.
 

 Valentine also asserts a number of other issues of fact that he contends are material to the disposition of his claim. Valentine disputes any suggestion by AHS that it was unaware of his asthma problems prior to the fall of 1993. Instead, he asserts that he was taken from work by ambulance more than once during 1992 and 1993, and that an AHS manager told him these incidents had been “disruptive” to other employees and he should get his asthma under control. He suggests that this manager’s comments and Sanders’s incorrect statement of when AHS learned of his disability are material, because they raise inferences of discriminatory animus. Valentine also contends that there is a genuine issue of material fact as to whether he met the Renewals Department requirement of “normally” working thirty hours per week and the extent to which his disability actually interfered with meeting this requirement. Valentine points to his own calculation of time worked for the thirty-five weeks preceding the termination of his employment and asserts that over the entire period he averaged 31.31 hours per week. He also contends that there is a genuine issue of material fact as to what, if any, other accommodations AHS considered or should have considered to meet their statutory obligations to provide “reasonable” accommodation. He also asserts that the extent to which his absences prior to his retransfer to Renewals and the eight-week attempted accommodation were considered in deciding to reduce him to part-time status is material, because consideration of such absences may demonstrate disability discrimination. Most critically, Valentine asserts there is a genuine issue of material fact as to whether Sanders agreed to his return to work as a part-time employee on January 19,1994, but then withdrew that offer on January 20, because it may demonstrate that accommodation was a sham and that a discriminatory animus motivated AHS’s decision.
 

 
 *1388
 

 IV. LEGAL ANALYSIS
 

 (including some further findings of fact)
 

 Valentine has brought his claims under both federal and state statutes that forbid employment discrimination because of a disability. Because Valentine’s federal claim is brought pursuant to the ADA, the court will first examine the purposes of the ADA and the analytical framework for the consideration of claims pursuant to that act. The court will then turn to the question of whether AHS has demonstrated that it is entitled to judgment as a matter of law on either discrimination claim, or whether Valentine has instead demonstrated that genuine issues of material fact preclude summary judgment on his disability discrimination claims.
 

 A, The Federal Disability Discrimination Claim
 

 The court has previously engaged in extensive discussions of the origins of the ADA.
 
 See Muller v. Hotsy Corp.,
 
 917 F.Supp. 1389, 1402-05 (N.D.Iowa 1996);
 
 Heather K. v. City of Mallard, Iowa,
 
 887 F.Supp. 1249, 1263-66 (N.D.Iowa 1995);
 
 Hutchinson v. United Parcel Serv., Inc.,
 
 883 F.Supp. 379, 387-90 (N.D.Iowa 1995);
 
 Fink v. Kitzman,
 
 881 F.Supp. 1347, 1368-71 (N.D.Iowa 1995). However, because the court views the historical context of the ADA as important to a determination of the requirements of the ADA, that discussion will be repeated in full here.
 

 1. The origins of the ADA
 

 The ADA provides that no employer “shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to ... the hiring, advancement or discharge of employees____” 42 U.S.C. § 12112. This language of the ADA is substantially identical to that of the Rehabilitation Act, 29 U.S.C. § 794, which forbids discrimination “by reason of his handicap.”
 
 Hedberg v. Indiana Bell Telephone Co., Inc.,
 
 47 F.3d 928, 932 (7th Cir.1995).
 

 The ADA and its attendant regulations were enacted, in part, to address perceived inadequacies in the Rehabilitation Act of 1973, 29 U.S.C. § 794.
 
 Helen L. v. DiDario,
 
 46 F.3d 325, 329 (3d Cir.) (describing in detail the history of Congressional efforts to attack disability discrimination),
 
 cert. denied,
 
 — U.S. -, 116 S.Ct. 64, 133 L.Ed.2d 26 (1995). Congress and the Executive found that section 504 of the prior act simply was not working as a means of eradicating discrimination and segregation in this country. For example, Congress found that, even though section 504 had been the law for seventeen years,
 

 society has tended to isolate and segregate individuals with disabilities, and despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem.
 

 42 U.S.C. § 12101(a)(2). Because Congress found further that public officials historically have been among the major perpetrators of segregated services in this country,
 
 see
 
 Timothy M. Cook,
 
 The Americans With Disabilities Act: The Move To Integration,
 
 64 Temp. L.Rev. 393, 400, 416 (1991) (identifying state laws mandating segregation of persons with disabilities and suggesting an analogy with the “Jim Crow laws” mandating racial discrimination), Title II of the ADA, 42 U.S.C. §§ 12131-12134, incorporates the “non-discrimination principles” of section 504 of the Rehabilitation Act, but extends them to state and local governments.
 
 Helen L.,
 
 46 F.3d at 331;
 
 Easley v. Snider,
 
 36 F.3d 297, 300 (3d Cir.1994).
 
 [7]
 
 Section 202 of Title II provides as follows:
 

 
 *1389
 
 [N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.
 

 42 U.S.C. § 12132.
 

 The ADA was not the first attempt to address the limitations of existing legislation to eradicate discrimination on the basis of disabilities. Periodically through the mid-1980s there had been attempts to amend the Civil Rights Act of 1964 to include people with disabilities.
 
 See, e.g.,
 
 H.R. 370, 99th Cong., 1st Sess. (1985). In 1983, the United States Commission of Civil Rights observed that “[Handicap discrimination and, as a result, its remedies differ in important ways from other types of discrimination and their remedies,” therefore disability rights laws explicitly modeled on prior civil rights statutes were not necessarily effective. U.S.Comm’n On Civil Rights, Accommodating The Spectrum Of Individual Abilities 48, 149 (1983). A federal judge had a more blunt assessment:
 

 [T]he Title VII and Title IX models were not automatically adaptable to the problem of discrimination against the handicapped, but involved a very different undertaking.
 

 Indeed, attempting to fit the problem of discrimination against the handicapped into the model remedy for race discrimination is akin to fitting a square peg into a round hole....
 

 Garrity v. Gallen,
 
 522 F.Supp. 171, 206 (D.N.H.1981). Another commentator identified more specific weaknesses of prior laws that attempted to address disability discrimination:
 

 Problems involved in trying to transfer principles and legal analysis developed in race and sex discrimination cases wholesale to disability discrimination were interwoven with other difficulties and shortcomings of disability nondiscrimination statutes prior to the ADA. Experience with the application of such prior statutes, including section 504 of the Rehabilitation Act of 1973, uncovered or highlighted weaknesses of such laws arising from then-statutory language, the limited extent of their coverage, inadequate enforcement mechanisms, and erratic judicial interpretations. Legal commentators have extensively described and lamented the flaws in the working, interpretation, and implementation of federal disability nondiscrimination statutes prior to the ADA.
 

 Robert L. Burgdorf, Jr.,
 
 The Americans With Disabilities Act: Analysis And Implications Of A Second-Generation Civil Rights Statute,
 
 26 Harv.C.R.-C.L.L.Rev. 413, 430-31 (1991) (footnotes omitted).
 

 In enacting the ADA, Congress found that “[Historically, society has tended to isolate and segregate individuals with disabilities, and ... such forms of discrimination ... continue to be a serious and pervasive social problem.” 42 U.S.C. § 12101(a)(2).
 
 Helen L.,
 
 46 F.3d at 332. The purpose of the ADA in light of this history of discrimination was summarized by Congressman Dellums:
 

 The history of different, separate, and unequal treatment of persons with disabilities, especially those with severe disabilities, could not be clearer. That history is in fact a stark reminder of the prejudice and misunderstanding that has characterized the treatment of minority citizens. This disparate treatment establishes an abundant factual predicate for the relief granted by [the ADA]. The Americans With Disabilities Act is a plenary civil rights statute designed to halt all practices that segregate persons with disabilities and those which treat them inferior [sic] or differently. By enacting the ADA, we are making a conscious decision to reverse a sad legacy of segregation and degradation.
 

 136 Cong.Rec. H2599 (daily ed. May 22, 1990) (statement of Rep. Dellums). Almost ten years earlier, a disabled legal scholar and disability rights advocate had written that
 

 
 *1390
 
 [t]he history of society’s formal methods for dealing with handicapped people can be summed up in two words: segregation and inequality. Individuals with handicapping conditions have faced an almost universal conspiracy to shunt them aside from the mainstream of society and to deny them an equal share of benefits and opportunities available to others____ At every juncture, the handicapped person has met with attempts to “push” him or her aside and to withhold that which is taken for granted from other persons.
 

 Robert L. Burgdorf, Jr., The Legal Rights Of Handicapped Persons: Cases, Materials, And Text 51 (1980).
 

 Before passing the ADA, Congress conducted fourteen hearings at the Capitol, and another sixty-three field hearings, and reviewed hundreds of discrimination diaries submitted for the legislative record by persons with disabilities. Americans With Disabilities Act of 1989: Hearings on S. 933 Before the Senate Comm, on Labor and Human Resources and the Subcomm. on the Handicapped, 101st Cong., 1st Sess. (1989) (testimony of Justin Dart, Chairman of Task Force on Rights and Empowerment of Americans with Disabilities). Congress was confronted with testimony that
 

 [b]y almost any definition, Americans with disabilities are uniquely underprivileged and disadvantaged. They are much poorer, much less well educated and have much less social life, have fewer amenities and have a lower level of self-satisfaction than other Americans.
 

 Senate Subcomm. on the Handicapped, S.Hrg. 166, pt. 2, at 9 (1987) (statement of Humphrey Taylor); quoted in S.Rep. No. 116, 101st Cong., 1st Sess. 8 (1989); also quoted in H.R.Rep. No. 485, 101st Cong., 2d Sess., pt. 2, at 31 (1990) U.S.Code Cong. & Admin.News 1990 pp. 267, 303, 313. Congress found that its hearings, investigations, and other sources revealed severe prejudice and discrimination towards disabled persons persisted in this country. Persons with disabilities, especially those with severe, noticeable disabilities, were told outright that they had been excluded because others would feel uncomfortable around them.
 
 See, e.g.,
 
 S.Rep. No. 116, 101st Cong., 1st Sess. 7 (1989), and H.R.Rep. No. 485, 101st Cong., 2d Sess., pt. 2, at 30 (1990) (a New Jersey zoo keeper refused to admit children with Down’s syndrome because he feared they would upset the chimpanzees; and, from remarks of Rep. Vanik, citing as an example of discrimination on the basis of disability from
 
 Alexander v. Choate,
 
 469 U.S. 287, 307 n. 29, 105 S.Ct. 712, 723 n. 29, 83 L.Ed.2d 661 (1985), a child with cerebral palsy was excluded from public school, although he was academically competitive and his condition was not actually physically disruptive, because his teacher claimed his physical appearance “produced a nauseating effect” on his classmates); 135 Cong.Rec. S10720 (daily ed. Sept. 7, 1989) (statement of Sen. Durenberger) (applicant with cerebral palsy described being told she was not qualified for job in metropolitan hospital because fellow employees would not be comfortable working with her); Senate Comm, on Labor and Human Resources, Rep. on the Americans With Disabilities Act, S.Rep. No. 116, 101st Cong., 1st Sess. 7 (1989) (applicant “crippled by arthritis” denied employment in higher education because “college trustees [thought] ‘normal students’ shouldn’t see her”); House Comm, on Education and Labor, Rep. on the Americans with Disabilities Act, H.R.Rep. No. 485, 101st Cong., 2d Sess., at 42, reprinted in 1990 U.S.Code Cong. & Admin.News 303,324 (1990) (testimony of Virginia Domini) (“[T]he general public doesn’t want to see you doing your laundry, being a case worker, a shopper, or a Mom. It is difficult to see yourself as a valuable member of society, and sometimes it is hard to see yourself as a person worthy of so much more respect than you get from the general public.”).
 

 Various draft bills to combat disability discrimination were introduced in 1988, and Congressional hearings followed. H.R. 4498, 100th Cong., 2d Sess., 134 Cong.Rec. E1307 (daily ed. April 29, 1988); S. 2345, 100th Cong., 2d Sess., 134 Cong.Rec. S5110 (daily ed. April 28, 1988). A revised ADA bill was introduced in the 101st Congress on May 9, 1989. S. 933, 101st Cong., 1st Sess., 135 Cong.Rec. S4978 (daily ed. May 9, 1989); H.R. 2273, 101st Cong., 1st Sess., 135 Cong. Rec. H1690 (daily ed. May 9, 1989). The
 
 *1391
 
 House and Senate versions were eventually reported out of committees, the House version was passed on May 22,1990, by a vote of 403 to 20. 136 Cong.Rec. H2638 (daily ed. May 22, 1990). Following conferences on differences between the House and Senate versions, the House approved the final version of the bill by a vote of 377 to 28 on July 12,1990,136 Cong.Rec. H4629 (daily ed. July 12, 1990), and the following day the Senate passed the ADA by a vote of 91 to 6. 136 Cong.Rec. S9695 (daily ed. July 13, 1990).
 

 In the final form of the ADA, Congress concluded that “[individuals with disabilities continually encounter various forms of discrimination____” 42 U.S.C. § 12101(a)(5).
 
 Helen L.,
 
 46 F.3d at 332. In furtherance of the objective of eliminating discrimination against the disabled, Congress stated that “the Nation’s proper goals regarding individuals with disabilities are to assure equality of opportunity, full participation, independent living, and economic self-sufficiency for such individuals.” 42 U.S.C. § 12101(a)(8);
 
 Helen L.,
 
 46 F.3d at 332. Thus, the purpose of the ADA is “to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities.” 42 U.S.C. § 12101(b);
 
 Vande Zande v. State of Wis. Dep’t of Admin.,
 
 44 F.3d 538, 541 (7th Cir.1995). In his remarks to the more than 3,000 people, most of whom had disabilities, gathered on the South Lawn of the White House for the signing ceremony, President Bush described the ADA as an “historic new civil rights Act ...[,] the world’s first comprehensive declaration of equality for people with disabilities.” President George Bush, Remarks by the President During Ceremony for the Signing of the Americans with Disabilities Act of 1990, 2 (July 26,1990) (on file with the Harvard Civil Rights-Civil Liberties Law Review), quoted in Robert L. Burgdorf, Jr.,
 
 The Americans With Disabilities Act: Analysis And Implications Of A Second-Generation Civil Rights Statute,
 
 26 Harv.C.R.-C.L.L.Rev. 413 (1991). Title I of the ADA, prohibiting discrimination in employment on the basis of a disability, became effective on July 26, 1992. Pub.L. 101-336, § 108 (“This title [subchap-, ter] shall become effective 24 months after the date of enactment [July 26, 1990].”). With this historical context for the ADA as background, the court may now examine the standards it is to apply in answering the threshold question in ADA litigation, “Is the plaintiff a qualified individual with a disability entitled to seek relief under the ADA?”
 

 2. Disability discrimination under the ADA
 

 Under the ADA, “disability” is broadly defined to include not only “a physical or mental impairment that substantially limits one or more of the major life activities of [the disabled] individual,” but also “ha[ving] a record of such an impairment,” or the state of “being regarded as having such an impairment.” 42 U.S.C. §§ 12102(2)(A), (B), (C);
 
 Aucutt v. Six Flags Over Mid-America, Inc., 85 F.3d 1311, 1318
 
 (8th Cir.1996);
 
 Wooten v. Farmland Foods,
 
 58 F.3d 382, 385 (8th Cir. 1995);
 
 Dutcher v. Ingalls Shipbuilding,
 
 53 F.3d 723, 725 (5th Cir.1995);
 
 Vande Zande,
 
 44 F.3d at 541;
 
 Bolton v. Scrivner, Inc.,
 
 36 F.3d 939, 942 (10th Cir.1994),
 
 cert. denied,
 
 — U.S. -, 115 S.Ct. 1104, 130 L.Ed.2d 1071 (1995);
 
 Chandler v. City of Dallas,
 
 2 F.3d 1385, 1391 (5th Cir.1993),
 
 cert. denied,
 
 — U.S. -, 114 S.Ct. 1386, 128 L.Ed.2d 61 (1994) (“disability” under ADA means a condition that “substantially limits” major life activity). Thus, Valentine must first show, or show that there is no dispute, that his asthma “substantially limits one or more of [his] major life activities.”
 

 a. Substantial limitations on major life activities
 

 In seeking further definition of the term “substantially limits” under the ADAl, the First Circuit Court of Appeals looked to the regulations implementing the ADA:
 

 Those regulations indicate that the question of whether an impairment is substantially limiting turns on ‘(1) the nature and severity of the impairment, (2) the duration or expected duration of the impairment, and (3) the [actual or expected] permanent or long-term impact ... of, or resulting from, the impairment.’ 29 C.F.R. § 1630, App. at 403 (1992).
 

 Cook v. State of R.I. Dep’t of Mental Health, Retardation, & Hospitals,
 
 10 F.3d 17, 25 n.
 
 *1392
 
 10 (1st Cir.1993). ADA regulations, as well as ADA interpretive guidance, make clear that temporary, minor injuries do not “substantially limit” a person’s major life activities. 29 C.F.R. §§ 1630.2(j), 1630 App., at 407. This court has applied this “substantially limits” a “major life activity” requirement in a number of cases under the ADA.
 
 See Muller,
 
 917 F.Supp. at 1411-12 (considering whether a person with spinal injury that was temporary nonetheless perceived by his employer as having a disability that substantially limited his major life activity of working);
 
 Hutchinson,
 
 883 F.Supp. at 395-96 (considering whether a person with shoulder and back injuries was substantially limited in any major life activity);
 
 Fink,
 
 881 F.Supp. at 1376-77 (considering whether a person with carpal tunnel syndrome was substantially limited in a major life activity).
 

 The ADA does not define “major life activities,” so the Eighth Circuit Court of Appeals has been guided by the definition provided in 29 C.F.R. § 1630.2 of the Equal Employment Opportunity Commission (EEOC) regulations on implementation of Title I of the ADA.
 
 Aucutt,
 
 85 F.3d at 1319.
 

 As defined in 29 C.F.R. § 1630.2(i), the phrase “major life activities” means “functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.” 29 C.F.R. § 1630.20). The regulations further provide that “[t]he inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.” 29 C.F.R. § 1630.2(j)(3)(i). Rather, a person claiming a disability must show that the impairment “significantly restrict[s] [his or her] ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities.”
 
 Id.; see also Bolton v. Scrivner, Inc.,
 
 36 F.3d 939, 942-44 (10th Cir.1994)
 
 (Bolton)
 
 (work-related injury preventing employee from performing his job as order selector in grocery warehouse was not substantial limitation in major life activity of working, as required for unlawful discharge claim under ADA, absent evidence showing restriction in ability to perform class of jobs or broad range of jobs in various classes),
 
 cert. denied,
 
 — U.S.-, 115 S.Ct. 1104, 130 L.Ed.2d 1071 (1995). Finally, the EEOC regulations state that the following factors should be considered in determining whether an individual, .is substantially limited in a major life activity: (i) the nature and severity of the impairment, (ii) its duration or expected duration, and (iii) its actual or expected long-term impact. 29 C.F.R. § 1630.2(j)(2).
 

 Aucutt,
 
 85 F.3d at 1319. Thus, an impairment or condition that affects “only a narrow range of jobs” is not considered as reaching a major life activity nor as substantially limiting one.
 
 See Wooten,
 
 58 F.3d at 386;
 
 Chandler,
 
 2 F.3d at 1392 (quoting
 
 Jasany v. United States Postal Serv.,
 
 755 F.2d 1244, 1249 n. 3 (6th Cir.1985)). This court has found certain alleged disabilities did not meet the requirements of substantially limiting the plaintiff in a major life activity.
 
 See Hutchinson,
 
 883 F.Supp. at 395-96 (back and shoulder injuries were not minor, but were temporary, and any remaining impairment was admittedly only slight, thus plaintiff was not disqualified from a wide range of jobs, and had failed to demonstrate substantial limitations in any other major life activity);
 
 Fink,
 
 881 F.Supp. at 1376-77 (plaintiff with carpal tunnel syndrome was restricted only in lifting, but was not substantially limited in any other way, and the lifting restriction did not substantially limit any major life activity or even impair plaintiffs job performance);
 
 Schwarz v. Northwest Iowa Community College,
 
 881 F.Supp. 1323, 1343-45 (N.D.Iowa 1995) (applying Iowa disability discrimination law, the court held that alleged “night blindness,” although it impaired the major life activity of seeing, did not limit the plaintiff in any significant way from obtaining satisfactory employment or disqualify her from a wide range of jobs). Furthermore, an employer’s belief that an employee is unable to perform one task with an adequate safety margin or that an employee can work in positions other than the one formerly occupied despite his impairment does not establish that the employer regards the employee as having a substantial limitation on the employee’s abili
 
 *1393
 
 ty to work in general.
 
 Chandler,
 
 2 F.3d at 1392-93.
 

 The summary judgment record does not generate a genuine issue of material fact as to whether Valentine is disabled within the meaning of the ADA. On this record, therefore, the court concludes that it is undisputed that Valentine’s asthma is a disability within the meaning of the ADA
 
 [8]
 

 b. Qualified individual with a disability
 

 Athough it is undisputed that Valentine has a disability, or is regarded as having a disability, which is the first step to entitlement to protection under the ADA Valentine must still show he is, or raise a genuine issue of material fact as to whether he is, a “qualified individual with a disability” in order to invoke protection under Title I of the ADA 42 U.S.C. § 12112(a);
 
 Benson v. Northwest Airlines,
 
 62 F.3d 1108, 1111 (8th Cir.1995). The ADA defines a “qualified individual with a disability” as “an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of tile employment position that such individual holds or desires.” 42 U.S.C. § 12111(8);
 
 see Benson,
 
 62 F.3d at 1111-12;
 
 White v. York Int’l Corp.,
 
 45 F.3d 357, 360 (10th Cir.1995) (citing this definition from the ADA);
 
 Tyndall v. National Educ. Ctrs.,
 
 31 F.3d 209, 212 (4th Cir.1994);
 
 and compare School Bd. of Nassau County v. Arline,
 
 480 U.S. 273, 287 n. 17, 107 S.Ct. 1123, 1131 n. 17, 94 L.Ed.2d 307 (1987) (similar definition in Rehabilitation Act, 29 U.S.C. § 794(a));
 
 Southeastern Comm. College v. Davis,
 
 442 U.S. 397, 406, 99 S.Ct. 2361, 2367, 60 L.Ed.2d 980 (1979) (Rehabilitation Act definition). Similarly, the ADA reaches beyond protection of people with disabilities irrelevant to performance of their jobs by defining “discrimination” as including an employer’s “not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless ... [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the ... [employer’s] business.”
 
 Vande Zande,
 
 44 F.3d at 541-42 (quoting 42 U.S.C. § 12112(b)(5)(A)). To put
 
 *1394
 
 it another way, although the ADA prohibits discharge of a person “because of’ a disability, an “employer may fire [an] employee because he cannot perform his job adequately, i.e., he is not a ‘qualified individual’ within the meaning of the ADA.”
 
 Hedberg,
 
 47 F.3d at 934 (citing 42 U.S.C. § 12111(8)). But before firing such an employee, the employer must consider whether “reasonable accommodation” can be made.
 
 Id.; Vande Zande,
 
 44 F.3d at 542.
 

 The Eighth Circuit Court of Appeals has formulated a two-pronged test of whether a person is “qualified” within the meaning of the ADA:
 

 (1) whether the individual meets the necessary prerequisites for the job, such as education, experience, training, and the like; and (2) whether the individual can perform the essential job functions, with or without reasonable accommodation.
 
 See
 
 42 U.S.C. § 12111(8); 29 C.F.R. § 1630.2(m) (1994); EEOC, A Technical Assistance Manual on the Employment Provisions (Title I) of the Americans with Disabilities Act II — 11 to 11-13 (1992).
 

 Benson,
 
 62 F.3d at 1111-12;
 
 see also White,
 
 45 F.3d at 361-62 (applying a similar two-art test of “qualified”);
 
 Tyndall,
 
 31 F.3d at 213 (same);
 
 Chandler,
 
 2 F.3d at 1393-94 (same). Valentine asserts that there are genuine issues of material fact as to whether or not he can meet this two-prong test.
 

 There are, of course, limits upon what accommodation is required under the ADA:
 

 The ADA does not, for example, necessarily insulate from discharge someone whose underlying disability causes him to be frequently drunk on the job. The ADA is not a job insurance policy, but rather a congressional scheme for correcting illegitimate inequities the disabled face.
 
 See
 
 42 U.S.C. § 12101(a).
 

 Hedberg,
 
 47 F.3d at 934. Under the terms of the statute, the accommodation must be “reasonable” and must not impose “undue hardship.” 42 U.S.C. § 12112(b)(5)(A);
 
 Vande Zande,
 
 44 F.3d at 542. The Eighth Circuit Court of Appeals has not yet considered the meaning of “reasonable accommodation” in a manner otherwise significant here, although it has noted that an employer need not provide an accommodation that completely removes from the disabled person’s job the essential functions that a person in that job
 
 must
 
 perform.
 
 Benson,
 
 62 F.3d at 1112-13.
 
 [9]
 

 In
 
 Vande Zande,
 
 the Seventh Circuit Court of Appeals considered first what was meant by “reasonable accommodation,” then considered the meaning of “undue hardship”:
 

 To “accommodate” a disability is to make some change that will enable the disabled person to work. An unrelated, inefficacious change would not be an accommodation of the disability at all. So “reasonable” may be intended to qualify (in the sense of weaken) “accommodation,” in just the same way that if one requires a “reasonable effort” of someone this means less than the maximum possible effort____ It would not follow that the costs and benefits of altering a workplace to enable a disabled person to work would always have to be quantified, or even that an accommodation would have to be deemed unreasonable if the cost exceeded the benefit however slightly. But, at the very least, the cost could not be disproportionate to the benefit. Even if an employer is so large or wealthy ... that it may not be able to plead “undue
 
 hardship,”
 
 it would not be required to expend enormous sums in order to bring about a trivial improvement in the life of a disabled employee____
 

 [One could argue that] the function of the “undue hardship” safe harbor, like the “failing company” defense in antitrust liability ... is to excuse compliance by a firm that is financially distressed, even though the cost of the accommodation to the firm might be less than the benefit to disabled employees.
 

 [However, t]his interpretation of “undue hardship” is not inevitable — in fact proba
 
 *1395
 
 bly is incorrect. It is a defined term in the Americans with Disabilities Act, and the definition is “an action requiring significant. difficulty or expense,” 42 U.S.C. § 12111(10)(A).
 

 Vande Zande,
 
 44 F.3d at 542-43. The court therefore concluded that costs and difficulties to the employer, in light of the employer’s financial health or survival, and the benefits to the employee were both relevant to the “reasonable accommodation” inquiry.
 
 Id.
 

 The conclusions of the court in
 
 Vande Zande
 
 concerning the extent of the required accommodation are reinforced by the legislative history of the ADA itself on this point. The report of the House Committee on Education and Labor states:
 

 The Committee wishes to make it clear that the principles enunciated by the Supreme Court in
 
 TWA v. Hardison,
 
 432 U.S. 63, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977), are not applicable to this legislation. In
 
 Hardison,
 
 the Supreme Court concluded that under Title VII of the Civil Rights Act of 1964 an employer need not accommodate persons with religious beliefs if the accommodation would require more than a de minimis cost for the employer. By contrast, under the ADA, reasonable accommodations must be provided unless they rise to the level of “requiring significant difficulty or expense” on the part of the employer, in light of the factors noted in the statute — i.e., a significantly higher standard than that articulated in
 
 Hardison.
 
 This higher standard is necessary in light of the crucial role that reasonable accommodation plays in ensuring meaningful employment opportunities for people with disabilities.
 

 H.R.Rep. No. 101-485, 101st Cong., 2d Sess., pt. 2, at 68 (1990);
 
 see also
 
 H.R.Rep. No. 101 — 485, 101st Cong., 2d Sess., pt. 3, at 40 (1990); S.Rep. No. 101-116, 101st Cong., 1st Sess. 36 (1989).
 
 [10]
 

 More recently, the Seventh Circuit Court of Appeals has clarified further the meaning of “reasonable accommodation.” The court noted that “reasonable accommodation” under the ADA includes
 

 job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment of modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.
 

 
 *1396
 

 Schmidt v. Methodist Hosp. of Indiana, Inc.,
 
 89 F.3d 342, 344 (7th Cir.1996) (quoting 42 U.S.C. •§ 12111(9)(B)). Furthermore, “[r]easonable accommodation does not require an employer to provide literally everything the disabled employee requests.
 
 Stewart v. County of Brown,
 
 86 F.3d 107, 110-11 (7th Cir.1996)____ [The employee’s] failure to accept [reasonable] accommodations renders him [or her] unqualified under the ADA.”
 
 Schmidt,
 
 89 F.3d at 344.
 

 Similarly, the Sixth Circuit Court of Appeals recognized that “reasonable accommodation” may “lie at the heart” of most ADA cases.
 
 Hankins v. The Gap, Inc.,
 
 84 F.3d 797, 800 (6th Cir.1996). That court also cited 42 U.S.C. § 12111(9) as stating some forms of “reasonable accommodation,” then explained further:
 

 The Appendix to the ADA regulations explains that “the employer providing the accommodation has the ultimate discretion to choose between effective accommodations, and may choose the less expensive accommodation or the accommodation that is easier for it to provide.” 29 C.F.R. pt. 1630, app. at 415. As the Supreme Court has held in analogous circumstances, an employee cannot make his employer provide a specific accommodation if another reasonable accommodation is instead provided.
 
 See Ansonia Bd. of Educ. v. Philbrook,
 
 479 U.S. 60, 68-69, 107 S.Ct. 367, 371-72, 93 L.Ed.2d 305 (1986). Athough an employee is not required to accept an offered accommodation, “if such individual rejects a reasonable accommodation ... that is necessary to enable the individual to perform the essential functions of the position ... the individual will not be considered a qualified individual with a disability.” 29 C.F.R. § 1630.9(d).
 

 Hankins,
 
 84 F.3d at 800-01. One of the real fighting issues in this case, and in this motion for summary judgment, is whether Valentine was a qualified employee, that is, whether he was capable of performing the essential function of attending his job if he was given a reasonable accommodation. However, before considering how an employer and employee are to arrive at a reasonable accommodation for the employee’s disability, and whether there is a genuine issue of material fact as to whether AHS provided a reasonable accommodation to Valentine’s disability, the court must address other matters pertinent to the analysis of Valentine’s ADA claim.
 

 3. Plaintiff’s prima facie case and the burden-shifting framework for ADA claims
 

 To qualify for relief under the ADA, Valentine must establish (1) that he is a disabled person within the meaning of the ADA; (2) that he is qualified, that is, with or without reasonable accommodation (which he must describe), he is able to perform the essential functions of the job; and (3) that his employer terminated him or subjected him to adverse decision, “because of’ his disability.
 
 Price v. S-B Power Tool,
 
 75 F.3d 362, 365 (8th Cir.1996),
 
 pet. for cert. filed,
 
 64 U.S.L.W. 3765 (April 29, 1996);
 
 Benson,
 
 62 F.3d at 1112;
 
 Wooten,
 
 58 F.3d at 385;
 
 White,
 
 45 F.3d at 361;
 
 Mason v. Frank,
 
 32 F.3d 315, 318-19 (8th Cir.1994);
 
 Tyndall,
 
 31 F.3d at 212;
 
 Chandler,
 
 2 F.3d at 1390;
 
 Gilbert v. Frank,
 
 949 F.2d 637, 640-42 (2d Cir.1991);
 
 Lucero v. Hart,
 
 915 F.2d 1367, 1371 (9th Cir.1990). As have other circuit courts of appeals, the Eighth Circuit Court of Appeals has embraced the familiar burden-shifting framework of
 
 McDonnell Douglas Corp. v. Green,
 
 411 U.S. 792, 802-04, 93 S.Ct. 1817, 1824-25, 36 L.Ed.2d 668 (1973), for use in analyzing claims under the ADA.
 
 See Aucutt,
 
 85 F.3d at 1318;
 
 S-B Power Tool,
 
 75 F.3d at 364-65.
 

 The Eighth Circuit Court of Appeals has now resolved the question that troubled this court in prior decisions about the formulation of a
 
 prima facie
 
 ease of disability discrimination under the ADA.
 
 See, e.g., Hutchinson v. United Parcel Serv., Inc.,
 
 883 F.Supp. 379, 393-95 (N.D.Iowa 1995). The Eighth Circuit Court of Appeals has now made clear that to establish a
 
 prima facie
 
 case under the ADA, a plaintiff must show the following: “(1) he or she is a ‘disabled’ person within the meaning of the ADA; (2) he or she is qualified to perform the essential functions of the job (either with or without reasonable accommodation); and (3) he or she has suffered an adverse employment action under circumstances from which
 
 *1397
 
 an inference of unlawful discrimination arises.”
 
 Aucutt,
 
 85 F.3d at 1318;
 
 S-B Power Tool, 75
 
 F.3d at 365;
 
 Benson,
 
 62 F.3d at 1112.
 
 [11]
 
 The inference of discrimination may arise, for example, from evidence that a plaintiff was replaced by or treated less favorably than similarly situated employees who are not in the plaintiffs protected class.
 
 S-B Power Tool, 75
 
 F.3d at 365 & n. 5.
 

 In the absence of an explanation from the employer, the
 
 prima facie
 
 case creates a rebuttable presumption of discrimination.
 
 S-B Power Tool, 75
 
 F.3d at 365 (citing
 
 Texas Dep’t of Community Affairs v. Burdine,
 
 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981)). The burden of production then shifts to the employer, AHS, to come forward with a legitimate, nondiscriminatory reason for its actions.
 
 Id.; Benson,
 
 62 F.3d at 1112. Finally, the burden shifts back to Valentine to prove that AHS’s proffered reason is pretextual and that intentional discrimination was the true reason for AHS’s actions.
 
 Id.
 
 (citing
 
 St. Mary’s Honor Ctr. v. Hicks,
 
 509 U.S. 502, 506-08, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993));
 
 Benson,
 
 62 F.3d at 1112;
 
 see also Rothmeier v. Investment Advisers, Inc.,
 
 85 F.3d 1328, 1333-34 (8th Cir.1996) (providing an extensive discussion of the nature of the third-stage inquiry in a Title VII case). As the party asserting discrimination, Valentine retains at all times the burden of persuading the trier of fact that he has been the victim of illegal discrimination due to his disability.
 
 Benson,
 
 62 F.3d at 1112.
 

 The employer bears a special burden of production, however, when the employer disputes the evidence that an employee can perform the essential functions of the job in question.
 
 Benson,
 
 62 F.3d at 1113. In such a situation, the employer must come forward with some evidence of what those “essential functions” are.
 
 Id.
 
 Although the employee retains the burden of persuasion at all times that he or she can
 
 perform
 
 the essential functions of the job, with or without accommodation, the reason the employer must come forward with evidence of the essential functions of a job is that “much of the information which determines those essential functions lies uniquely with the employer.”
 
 Id.
 

 For example, the ADA and its implementing regulations direct us to consider, among other things, the following: “the employer’s judgment as to what functions of a job are essential,” 42 U.S.C. § 112111(8); job descriptions prepared before advertising or interviewing applicants,
 
 id.;
 
 “[t]he consequences of not requiring the [employee] to perform the function,” 29 C.F.R. § 1630.2(n)(3)(iv) (1994); and the work experience of current and former employees. 29 C.F.R. § 1630.2(n)(3)(vi), (vii) (1994).
 
 See Americans with Disabilities: Practice and Compliance Manual
 
 § 7:42 (George L. Bounds et al., eds., 1995) (“Inquiry into whether a particular function is essential focuses on whether the employer actually requires employees in the position to perform the functions that the employer asserts are essential”).
 

 Benson,
 
 62 F.3d at 1113.
 

 Here, AHS has specifically challenged Valentine’s ability to meet an essential function of his job, attendance. However, AHS has met its burden of production to show that regular attendance during “core” times is an essential function of the position of Renewals Representative.
 
 Id.
 
 AHS has put forward evidence demonstrating that there is a short window of opportunity near the expiration of one of its service contracts when a potential renewals customer must be contacted and a limited window of opportunity each week day when such customers can be contacted. AHS has also put forward evidence indicating the difficulties unexpected absences can have on the Renewals Department. This evidence is confirmed by AHS’s personnel policy on attendance, which was promulgated before this litigation began. Valentine argues that even if attendance, and attendance at specific times of the day, is an essential function of the job of a Re
 
 *1398
 
 newal Representative, these facts do not necessarily preclude reasonable accommodation of his disability. The court will next consider the question of the adequacy of Valentine’s
 
 prima facie
 
 case, including whether he is qualified to meet the essential function of attendance, with or without “reasonable accommodation.”
 

 4. Valentine’s ADA claim
 

 a. Valentine’s prima facie case and the process to determine “reasonable accommodation ”
 

 The present motion for summary judgment on Valentine’s ADA claim hinges on whether he can meet the second element of his
 
 prima facie
 
 case, and hence prove or generate a genuine issue of material fact as to the second element of his ADA claim, by showing that he is qualified to be an AHS Renewals Representative with or without reasonable accommodation. AHS contends that Valentine cannot show he is qualified, because he failed to meet the essential function of attendance, even with reasonable accommodation as offered by the company or proposed by Valentine, and then refused to accept the company’s subsequent accommodation, part-time employment.
 

 However, AHS’s argument presupposes that it has, as a matter of law, provided “reasonable accommodation” or properly engaged in the process of determining what would be a “reasonable accommodation” in this case. Two recent decisions from the circuit courts of appeals discuss the required process for determination of what reasonable accommodation an employer must provide.
 

 i. The “interactive process” to determine reasonable accommodation.
 
 In the more recent of these decisions,
 
 Taylor v. Principal Fin. Group, Inc.,
 
 93 F.3d 155 (5th Cir.1996), the Fifth Circuit Court of Appeals wrote,
 

 “In general ... it is the responsibility of the individual with the disability to inform the employer that an accommodation is needed.” 29 C.F.R. § 1630.9, App. (1995). Once such a request has been made, “[t]he appropriate reasonable accommodation is best determined through a flexible, interactive process that involves both the employer and the qualified individual with a disability.” 29 C.F.R. § 1630.9, App. (1995). In other words, the responsibility for fashioning a reasonable accommodation is shared between the employee and employer. 29 C.F.R. § 1630.9, App. (1995).
 

 Taylor,
 
 93 F.3d at 165. Similarly, the Seventh Circuit Court of Appeals has described this “interactive” process to determine “reasonable accommodation”:
 

 The employer has at least some responsibility in determining the necessary accommodation. The federal regulations implementing the ADA state:
 

 To determine the appropriate reasonable accommodation it may be necessary for the [employer] to initiate an informal, interactive process with the qualified individual with a disability in need of the accommodation. This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations.
 

 29 C.F.R. § 1630.2(o)(3) (1995). But the regulations envision an interactive process that requires participation by both parties:
 

 [T]he employer must make reasonable effort to determine the appropriate accommodation. The appropriate reasonable accommodation is best determined through a flexible, interactive process that involves both the employer and the [employee] with a disability.
 

 29 C.F.R., pt. 1630, app.;
 
 see also Grenier v. Cyanamid Plastics, Inc.,
 
 70 F.3d 667, 677 (1st Cir.1995).
 

 * * * * * *
 

 Neither the ADA nor the regulations assign responsibility for when the interactive process fails.
 

 No hard and fast rule will suffice, because neither party should be able to cause a breakdown in the process for the purpose of either avoiding or inflicting liability. Rather, courts should look for signs of failure to participate in good faith or failure by one of the parties to make reasonable efforts to help the other party determine what specific accommodations are
 
 *1399
 
 necessary. A party that obstructs or delays the interactive process is not acting in good faith. A party that fads to communicate, by way of initiation or response, may also be acting in bad faith. In essence, courts should attempt to isolate the cause of the breakdown and then assign responsibility.
 

 Beck v. Wisconsin Bd. of Regents,
 
 75 F.3d 1130, 1135-36 (7th Cir.1996) (finding the disabled employee caused the breakdown of the interactive process by failing ever to clarify for the university exactly what action it needed to take).
 

 In the present case, it is apparent that Valentine initially “inform[ed] the employer that an accommodation is needed.” 29 C.F.R. § 1630.9, App. (1995);
 
 Taylor,
 
 93 F.3d at 164-65. He specifically asked for a meeting between himself and his physician and AHS management employees. Also, AHS initially responded appropriately to that request by holding such a meeting and considering accommodation alternatives. The question is whether something went wrong subsequently, and, if so, upon whom does responsibility for that breakdown lie.
 

 it.
 
 Breakdown of the process.
 
 Here, each party points at the other as causing the breakdown of the interactive process. Asking who caused the breakdown in the circumstances of this ease is another way of asking whether Valentine quit or was fired. Valentine asserts that AHS acted in bad faith by changing the rules of the interactive process by deciding that he should be reduced to part-time when the first agreed accommodation, which he thought was a “trial” accommodation, failed. AHS contends that not only did Valentine fail to meet the requirements under the agreed attendance accommodation, failing to average thirty hours per week in each two-week period of the eight-week pay period, he failed to meet the requirements of the only other accommodation he suggested, which was to average thirty hours per week during the entire eight-week pay period. Yet, AHS contends further that Valentine caused the breakdown of the interactive process by refusing on more than one occasion to consider AHS’s “counter offer” of part-time employment as a reasonable aceommodation. Part-time employment is specifically identified under the ADA as a possible reasonable accommodation. 42 U.S.C. § 12111(9)(B). Valentine asserts that if part-time employment was a reasonable accommodation, AHS also caused the breakdown in the interactive process by withdrawing its offer of part-time employment after he accepted it.
 

 The court believes that AHS’s offer of part-time employment was probably gratuitous, because Valentine had never identified or requested such an accommodation. However, under 42 U.S.C. § 12111(9)(B), part-time employment is a possible reasonable accommodation. It is apparent that AHS thought it was reasonable, at least initially, because AHS offered it. It is also apparent that at some point Valentine agreed it was reasonable, because he now claims he accepted that accommodation. The undisputed record demonstrates that, at least twice, Valentine rejected that proffered reasonable accommodation. Such a rejection of a reasonable accommodation could have established that Valentine was not a “qualified individual” under the ADA. 29 C.F.R. § 1630.9(d);
 
 Schmidt,
 
 89 F.3d at 344-45;
 
 Hankins,
 
 84 F.3d at 801.
 

 The court finds that genuine issues of material fact as to who caused the breakdown of the accommodation process preclude summary judgment in AHS’s favor on the ground that Valentine has failed to establish a
 
 prima facie
 
 case. Whether either AHS’s proffered accommodation, actually implemented, of averaging hours every two weeks, or Valentine’s requested accommodation of averaging every eight weeks, is “reasonable” is not, however, among those genuine issues of material fact. As a matter of law, the undisputed record demonstrates that Valentine failed to meet the requirements of either accommodation. Therefore, neither accommodation established that Valentine was a qualified individual, either with or without accommodation.
 
 Aucutt,
 
 85 F.3d at 1318 (establishing this as the second element of the
 
 prima facie
 
 case);
 
 S-B Power Tool,
 
 75 F.3d at 365 (same);
 
 Benson,
 
 62 F.3d at 1112 (same). Nor is there a genuine issue of material fact, that is, one that matters under
 
 *1400
 
 governing law,
 
 Anderson, 477
 
 U.S. at 248, 106 S.Ct. at 2510;
 
 Beyerbach,
 
 49 F.3d at 1326;
 
 Hartnagel,
 
 953 F.2d at 394, concerning whether the parties agreed to try alternatives if the first accommodation implemented failed. No such issue is raised, because AHS in fact offered a further accommodation, part-time employment, upon the failure of the first accommodation that had been implemented.
 

 The only genuine issues of material fact apparent as to the
 
 prima facie
 
 case are therefore the following. First, there is a genuine issue of material fact as to whether the proffer of part-time employment was in fact a proffer of a “reasonable accommodation.”
 
 [12]
 
 If it was not, Valentine’s refusal of that proffered accommodation does not remove him from the category of qualified persons under the ADA.
 
 Cf.
 
 29 C.F.R. § 1630.9(d);
 
 Schmidt,
 
 89 F.3d at 344-45;
 
 Hankins,
 
 84 F.3d at 801. If part-time employment was a reasonable accommodation, although it is undisputed that Valentine twice refused to accept part-time employment, on January
 
 11
 
 and 18, 1994, AHS is not necessarily entitled to judgment in its favor. Rather, the next series of genuine issues of material fact arises. That series is as follows: whether AHS offered such art accommodation a third time, on January 19; whether Valentine accepted the offer on January 19, 1994; whether AHS withdrew the offer before or after Valentine had accepted it; and whether it was reasonable for AHS to withdraw the offer. This last genuine issue of material fact is not only related to the question of whether the offer was itself reasonable to the employer, it is also related to the question of whether the withdrawal of the offer was a “bad faith” interference with the interactive process causing the breakdown of that process, which AHS had until then continued by offering part-time employment repeatedly, despite Valentine’s rejections of such an accommodation.
 
 [13]
 
 Because of these genuine issues of material fact, the court must move on to the second and third stages of the analysis of this employment discrimination claim.
 
 [14]
 

 As a further matter, the court finds that Valentine has failed to generate a genuine issue of material fact concerning the adequacy of AHS’s efforts to accommodate his disability on the basis of the other accommodations he
 
 now
 
 asserts are reasonable, but which he never raised during the interactive process.
 
 [15]
 
 The court is mindful that an ADA
 
 *1401
 
 plaintiff must at some point describe the reasonable accommodations that would have made him or her “qualified” for a job,
 
 see, e.g., White,
 
 45 F.3d at 361, but precisely when such a description must be made is uncertain. An employer has an obligation to enter into an “interactive process” to determine what accommodation of a disability is reasonable once the employer has notice of a disability or a specific request for accommodation has been made.
 
 See, e.g., Beck, 75
 
 F.3d at 1137. However, an employee also has an obligation in the interactive process to provide the employer with enough information for the employer to gain an understanding of what action it should take.
 
 Id.
 
 at 1135-36. The court thinks it likely that the employee’s failure to describe any accommodation prior to termination would not be fatal in the situation where an employer immediately fires an employee upon learning of the employee’s disability, thereby precluding any opportunity for the employee to specify or describe what accommodations are required. However, the record here indicates that AHS attempted at least some part of the interactive process once reasonable accommodation was requested and that Valentine had some opportunity to suggest reasonable accommodations at the time. Whatever the time frame may be for a disabled employee to “describe” the reasonable accommodations sufficient to qualify him or her for a job, the court is confident that it is not so generous as to encompass suggestions made only in a resistance to summary judgment on the eve of trial more than two years after the alleged failure to accommodate, but never raised in the interactive process. Hence, it is too late for the reasonableness of a number of accommodations Valentine asserts only now to raise genuine issues of material fact as to the adequacy of AHS’s accommodation efforts. This matter will therefore proceed to trial, if at all, only on the reasonableness of part-time employment as an accommodation to Valentine’s disability.
 

 b. Second and third stage issues
 

 AHS asserts that, regardless of whether Valentine can demonstrate that he was a “qualified individual” capable of performing the essential functions of his job with some reasonable accommodation, AHS nonetheless has proffered a legitimate, nondiscriminatory reason for discharging him, if indeed AHS discharged Valentine. That reason is chronic absenteeism and poor performance. AHS’s proffer of a legitimate, nondiscriminatory reason for its adverse employment action moves this case to the third stage of the
 
 McDonnell Douglas
 
 analysis, which is whether Valentine can generate a genuine issue of material fact as to whether AHS’s proffered reason is a pretext for discrimination.
 
 S-B Power Tool, 75
 
 F.3d at 365.
 

 The court finds that Valentine has indeed generated such a genuine issue of material fact. There is at least a reasonable inference from the record that the proffer of part-time employment was a proffer of a reasonable accommodation. There is also a reasonable inference from the record that Valentine accepted such an offer the third time it was made, on January 19, 1994, by Peg Sanders. AHS has not directly challenged Valentine’s assertion that an offer of part-time employment was made on January 19,1994, then withdrawn. Instead, AHS has argued that even if such an offer was made, its withdrawal of the offer was proper, because AHS could have fired Valentine for chronic absenteeism and poor performance. However, the court finds that the withdrawal of a reasonable offer of accommodation after it has been accepted would give rise to an inference of illicit motive. Bad faith in the
 
 *1402
 
 interactive process necessarily suggests a desire not to accommodate an employee’s disability, or, to put it another way, suggests discriminatory animus. There is consequently an inference of pretext and intentional discrimination in this case.
 
 Crawford,
 
 37 F.3d at 1341 (“[b]ecause discrimination cases often depend on inferences rather than on direct evidence, summary judgment should not be granted unless the evidence could not support any reasonable inference for the nonmovant.”);
 
 see also Landon,
 
 72 F.3d at 628 (holding that where the employer’s motivation is material, “a jury must determine this question of fact”). Therefore, genuine issues of material fact at these later stages of the burden-shifting analysis also preclude summary judgment in AHS’s favor on Valentine’s ADA claim.
 

 B. The State Disability Discrimination Claim
 

 The court has recently articulated the standards for a disability discrimination claim under the Iowa Civil Rights Act, Iowa Code Ch. 216, in
 
 Muller v. Hotsy Corp.,
 
 917 F.Supp. 1389, 1413-17 (N.D.Iowa 1996). The court finds that it suffices to say here that under Iowa law, an employer must also reasonably accommodate an employee’s disability and an employee must demonstrate that he or she is able “ ‘to perform the job in a reasonably competent and satisfactory manner given reasonable accommodation by the employer.’”
 
 Muller,
 
 917 F.Supp. at 1415 (quoting
 
 Henkel Corp. v. Iowa Civil Rights Comm’n,
 
 471 N.W.2d 806, 810 (1991));
 
 see also Boelman v. Manson State Bank,
 
 522 N.W.2d 73, 80 (1994) (describing the allocation of burdens of proof on “reasonable accommodation” under Iowa law). Thus, the same genuine issues of material fact that preclude summary judgment on Valentine’s federal claim, premised on the failure to provide “reasonable accommodation,” also suffice to preclude summary judgment on Valentine’s state-law claim.
 

 V. CONCLUSION
 

 The court finds that, in light of the record, the issue in this case boils down to the question of which party caused the breakdown of the “interactive process” required between an employer and a disabled employee to determine what accommodations of the employee’s disability are “reasonable.” On that question, there are genuine issues of material fact. Consequently, there are genuine issues of material fact precluding summary judgment on the question of whether Valentine was a “qualified” individual with a disability under either the ADA or the ICRA. Furthermore, the court finds that there are genuine issues of material fact on whether AHS’s proffered legitimate reason for adverse employment action against Valentine was a pretext for discrimination. The court finds that bad faith in the interactive process necessarily suggests a desire not to accommodate an employee’s disability, or, in other words, suggests discriminatory animus. Therefore, a genuine issue of material fact as to bad faith in the interactive process also generates a genuine issue of material fact as to pretext and discriminatory animus.
 

 These genuine issues of material fact preclude summary judgment on either Count I or Count II of Valentine’s complaint. AHS’s motion for summary judgment is therefore denied,
 

 IT IS SO ORDERED.
 

 [1]
 

 . In his complaint, Valentine alleges that his disability, or "perceived” disability, was asthma. In his brief in resistance to summaty judgment, Valentine asserts that he suffers "from severe, chronic reactive airway disease, complicated by chronic sinusitis, gastroesophageal reflux, vocal cord dysfunction, and sleep apnea,” which he describes collectively as "asthma.”
 

 [2]
 

 . AHS was granted leave to file a signed and notarized supplemental affidavit of Peg Sanders, an unsigned copy of which accompanied the reply brief, not later than August 27, 1996. A signed copy of the affidavit was indeed filed on August 27, 1996.
 

 [3]
 

 . An issue of material fact is genuine if it has a real basis in the record.
 
 Hartnagel,
 
 953 F.2d at 394 (citing
 
 Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,
 
 475 U.S. 574, 586-87, 106 S.Ct. 1348, 1355-56, 89 L.Ed.2d 538 (1986)). “Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.”
 
 Anderson v. Liberty Lobby, Inc.,
 
 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986);
 
 Beyerbach,
 
 49 F.3d at 1326;
 
 Hartnagel,
 
 953 F.2d at 394.
 

 [4]
 

 . In his self-evaluation, Valentine gave himself a score of
 
 “2"
 
 on attendance.
 

 [5]
 

 . Not counting the disputed day, AHS contends that Valentine's average per week for the eight weeks was only 28 hours.
 

 [6]
 

 . The record indicates that the basis for this comment was Valentine’s concern that the January 4, 1994, absence had been miscounted as unexcused rather than vacation time.
 

 [7]
 

 . These congressional findings are similar to those of Justice Stevens and Justice Marshall in their concurrences in
 
 Cleburne v. Cleburne Living Ctr., Inc.,
 
 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985), a case involving discrimination against the mentally retarded. Justice Stevens found that "through ignorance and prejudice the mentally retarded ‘have been subjected to a history of unfair and often grotesque mistreatment.' "
 
 Cleburne,
 
 473 U.S. at 455, 105 S.Ct. at 3262 (Stevens, J., concurring). Similarly, Justice Marshall found that
 

 [a] regime of state-mandated segregation and degradation soon emerged that in its virulence and bigotry rivaled, and indeed paralleled, the worst excesses of Jim Crow. Massive custodial institutions were built to warehouse the retarded for life; the aim was to halt reproduction of the retarded and "nearly extinguish their race.” Retarded children were categorically
 
 *1389
 
 excluded from public schools, based on the false stereotype that all were ineducable and on the purported need to protect nonretarded children from them. State laws deemed the retarded "unfit for citizenship.”
 

 Id.
 
 at 462-63, 105 S.Ct. at 3266 (Marshall, J., concurring) (footnotes omitted).
 

 [8]
 

 . Because AHS has not disputed that Valentine is actually disabled within the meaning of the ADA, the court need not consider Valentine's alternative pleading that AHS "regarded [Valentine] as having" such a disability, which might also run counter to the prohibitions of the ADA. 42 U.S.C. § 12102(2)(C). However, two recent decisions of the Eighth Circuit Court of Appeals touching on the "regarded as having” prong of ADA protection should be mentioned. In
 
 Wooten v. Farmland Foods,
 
 58 F.3d 382 (8th Cir.1995), the Eighth Circuit Court of Appeals determined that "a person is 'regarded as having’ an impairment that substantially limits the person's major life activities when other people treat that person as having a substantially limiting impairment.”
 
 Wooten,
 
 58 F.3d at 385 (citing 29 C.F.R. § 1630.2(1 )(3)). The court further found that the focus in determining whether a person is regarded as having a disability is on "the impairment’s effect upon the attitudes of others.”
 
 Id.
 
 (citing
 
 Byrne v. Board of Educ., Sch. of West Allis,
 
 979 F.2d 560, 564 (7th Cir.1992)). Although the court found that "working” was a major life activity, the court also found that "working” does not mean working at a particular job of that person’s choice.
 
 Id.
 
 at 386. Furthermore, the court held that a person perceived as having "an impairment that disqualifies a person from only ■ a narrow range of jobs is not considered [by the employer as having] a substantially limiting one.”
 
 Id.
 
 (quoting
 
 Heilweil v. Mount Sinai Hosp.,
 
 32 F.3d 718, 723 (2d Cir.1994),
 
 cert.
 
 denied, - U.S. -, 115 S.Ct. 1095, 130 L.Ed.2d 1063 (1995));
 
 see also Jasany v. United States Postal Serv.,
 
 755 F.2d 1244, 1249 n. 3 (6th Cir. 1985) (court concluded that the employer had not regarded the employee as handicapped because his eyesight prevented his driving, because impairment "that affects only a narrow range of jobs can be regarded either as not reaching a major life activity or as not substantially limiting one.").
 

 Still more recently, the Eighth Circuit Court of Appeals has referred to the applicable EEOC regulations for guidance on what constitutes being "regarded as having” an impairment:
 

 [The EEOC regulations] provide as follows:
 

 (l) Is regarded as having such an impairment
 
 means:
 

 (1) Has a physical or mental impairment that does not substantially limit major life activities but is treated by a covered entity as constituting such limitation;
 

 (2) Has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment; or
 

 (3) Has none of the impairments defined____ [above] but is treated by a covered entity as having a substantially limiting impairment.
 

 29 C.F.R. § 1630.2(/)(l-3).
 

 Aucutt,
 
 85 F.3d at 1319-20.
 

 [9]
 

 . In
 
 Benson,
 
 the court considered possible accommodations under the ADA, including "restructuring” of a job in terms of reallocating marginal functions of a job, citing 42 U.S.C. § 12111(9)(B); 29 C.F.R. § 1630.2(o )(2)(ii) (1994); EEOC, Technical Assistance Manual at III — 21, and "reassignment to a vacant position,” citing 42 U.S.C. § 12111(9)(B); 29 C.F.R. 1630.2(o )(2)(ii).
 
 Benson,
 
 62 F.3d at 1112 & 1114.
 

 [10]
 

 . At oral arguments, the parties suggested that Iowa decisions since the passage of the ADA had not made altogether clear what standard applies to “reasonable accommodation” under Iowa anti-discrimination law, although the Iowa Supreme Court had formerly specifically embraced the test enunciated in
 
 Hardin.
 
 The parties agreed, however, that among the most recent statements on the matter by the Iowa Supreme Court was to be found in
 
 Courtney v. American Nat'l Can Co.,
 
 537 N.W.2d 681 (Iowa 1995). In
 
 Courtney,
 
 the Iowa Supreme Court stated the following:
 

 Under Iowa law, an employer must make "a reasonable effort” to accommodate an employee’s disability.
 
 Cerro Gordo County Care Facility v. Iowa Civil Rights Comm'n,
 
 401 N.W.2d 192, 197 (Iowa 1987). This standard allows an employer some flexibility in fashioning an accommodation.
 
 Id.
 
 In creating an accommodation, the employer should consider the employee’s needs and desires as well as the economic and other realities the employer may encounter.
 
 Id.
 

 Generally, any expense which is more than de minimis is not required.
 
 Compare Smith [v. ADM Feed Corp.],
 
 456 N.W.2d [378,] 386 [(1990)]
 
 and Brown v. Hy-Vee Food Stores, Inc.,
 
 407 N.W.2d at 598, 599 (Iowa 1987)
 
 with Cerro Gordo County Care Facility,
 
 401 N.W.2d at 197 ("we do not intend to suggest that such a low standard of accommodation [referring to de minimis cost] is sufficient in every circumstance”). Additionally, an Iowa employer may reject an accommodation that substantially impinges on the rights of other employees.
 
 Smith,
 
 456 N.W.2d at 386;
 
 Frank [v. American Freight Sys., Inc.],
 
 398 N.W.2d [797,] 803 [(Iowa 1987)]. Furthermore, we have repeatedly recognized that an accommodation which changes the essential nature of the job is unreasonable.
 
 Boelman [v. Manson State Bank],
 
 522 N.W.2d [73,] 81 [(Iowa 1994)];
 
 Henkel Corp. v. Iowa Civil Rights Comm’n,
 
 471 N.W.2d at 806, 811 (Iowa 1991);
 
 Smith,
 
 456 N.W.2d at 386.
 

 Courtney,
 
 537 N.W.2d at 687. Thus, it appears that if AHS provided "reasonable accommodation” under the stricter standard required under the ADA, it necessarily provided "reasonable accommodation” under Iowa’s de minimis cost standard. However, adequate accommodation under Iowa law might well not be adequate under the ADA.
 

 [11]
 

 . Furthermore, the Eighth Circuit Court of Appeals has noted that for an ADA claim in a reduction-in-force situation, a situation not present here, "the plaintiff must also show that his or her disability was a determining factor in his or her termination.”
 
 Aucutt,
 
 85 F.3d at 1318 (citing
 
 Johnson v. Minnesota Historical Soc'y,
 
 931 F.2d 1239, 1243 (8th Cir.1991)).
 

 [12]
 

 . Valentine argues that his rejection of part-time employment was reasonable, because he was not properly informed about the nature of part-time employment as to hours, commissions, and the possibility of continuing health insurance benefits.
 

 [13]
 

 . This is another way of saying that AHS’s offer of part-time employment was gratuitous. The court has no desire to discourage employers from making suggestions as to accommodations by raising the possibility of liability where the employer has done more than it needs to. However, once an employer makes an offer of accommodation, the court reads the ADA and the cases discussed herein to require that such an offer not be withdrawn in bad faith.
 

 [14]
 

 . AHS has not called into question any other elements of Valentine's
 
 prima facie
 
 case.
 

 [15]
 

 . In his brief in resistance to AHS’s motion for summary judgment, Valentine asserts that AHS failed to reasonably accommodate his disability, and also exhibited callous disregard for his physical and mental well being, by doing or not doing the following:
 

 1. By treating his asthma-related absences as disciplinary problems instead of a legitimate medical condition over which he had little, if any, control.
 

 2. By failing to acknowledge [Valentine's] disability and work with him to reasonably accommodate him before, not after, his lack of attendance was viewed as problematic for AHS.
 

 3. By failing to affirmatively provide [Valentine] with information about his rights under the Americans With Disabilities Act.
 

 4. By failing to educate management personnel about the rights of employees with disabilities under federal and state statutes, and by encouraging them to approach accommodation issues with a spirit of tolerance, compassion and optimism as opposed to the anti-disability environment that existed at AHS during [Valentine’s] employment there — an environment in which Dave Quandt feels free to chastise [Valentine] about disrupting the office when he was rushed to the hospital by ambulance due to his inability to breathe; an environment in which Cathy Engel has to warn [Valentine] in secret not to mention his depression to anyone at AHS for fear of reprisals.
 

 5. By failing to investigate or consider other possible accommodations for [Valentine], such as arranging for him to “modem in” from home on days when he felt unwell but was able
 
 *1401
 
 to make calls; by permitting [Valentine] to "average" 30 hours per week through the use of “extra credit” hours for exceptional performance; by permitting other sales representatives to utilize [Valentine's] leads; or by excusing and/or forgiving absences which occurred prior to any attempt at accommodation.
 

 6. By failing to thoroughly explain the terms and conditions of part-time employment to [Valentine] prior to asking him to decide whether to accept a demotion from full-time to part-time status.
 

 7. By failing to promptly and thoroughly explain [Valentine’s] rights concerning continuance of insurance coverage under federal and state law.
 

 Plaintiff’s Memorandum Of Law In Support Of Resistance To Defendant’s Motion For Summary Judgment, pp. 28-29.